[Cite as *State v. Csehi*, 2024-Ohio-779.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

NICHOLAS TIMOTHY CSEHI,

        Defendant-Appellant.

**CASE NO. 2023-A-0040**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2022 CR 00072

---

## O P I N I O N

Decided: March 4, 2024
Judgment: Affirmed

---

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Christopher R. Fortunato*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Edward F. Borkowski, Jr.*, P.O. Box 609151, Cleveland, OH 44109 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, Nicholas T. Csehi, appeals his conviction for Murder on the grounds that (1) the plaintiff-appellee, the State of Ohio, failed to disprove that he acted in self-defense and (2) there was racial bias in the selection of jurors. For the following reasons, Csehi's conviction is affirmed.

{¶2} On March 11, 2022, the Ashtabula County Grand Jury indicted Csehi for Aggravated Murder (Count One), an unclassified felony in violation of R.C. 2903.01(A) and 2929.02(A), and Murder (Count Two), an unclassified felony in violation of R.C.

2903.02(A) and (D) and 2929.02(B). Both Counts included a Firearm Specification as provided for in R.C. 2941.145(A).

{¶3} Between June 5 and 7, 2023, a jury trial was held. The jury returned a verdict of "not guilty" to the charge of Aggravated Murder and "guilty" to the charge of Murder including the Firearm Specification.

{¶4} On July 14, 2023, the trial court sentenced Csehi to serve an indefinite term of fifteen years to life of imprisonment for Murder and an additional term of three years for the Firearm Specification to be served consecutively to and prior to the sentence for Murder.

{¶5} On July 21, 2023, Csehi filed a Notice of Appeal. On appeal, he raises the following assignments of error:

> [1.] Appellant's conviction is against the manifest weight of the evidence.
>
> [2.] The trial court erred by overruling Appellant's *Batson* challenge.

{¶6} In the first assignment of error, Csehi argues the prosecution failed to meet its burden of persuasion in disproving his claim of self-defense beyond a reasonable doubt. The following testimony, relevant to the claim of self-defense, was presented at trial:

{¶7} Heather Csehi testified that she is Csehi's mother. On February 1, 2022, she was living with her boyfriend, Randall Cohen. On that date, Cohen was away from the house shoveling snow to make money. Heather was watching her two granddaughters while her son and his girlfriend (the granddaughters' mother), Kaitlyn Colby, went to a movie. At about 9:30 p.m., Cohen returned with food for the family.

2

About a half an hour later, Csehi and Colby returned to pick up the children. Heather was talking to Csehi in the kitchen about the family dog while Cohen was in the living room.

> I'm talking to my son and Randall starts yelling, 'I take care of the dog. I do this. I do that'. And he was being offended by what Nick was saying about Puppy [the dog] being so small. And the next thing I know, Nick is saying I'm just talking to my mom, you know? Randall hopped off the couch and came charging at Nick. And they fought in the dining room. And Nick got him down on the ground and tried to leave. He's like leave me alone. And Randall just wouldn't let him go. He's yelling at him, they're having words. My son tries to leave, and Randall catched [sic] him. Caught him in the kitchen heading out, you know, getting ready to go down the stairs to leave the house. And he caught him and they fought again. And Nick's telling him the whole time just leave me alone, I don't want anything to do with you. And Randall's just going off, just about everything. Telling him I love you like a son, and my son's like I don't need your love, leave me alone, leave my family alone. Just stay away from me. And he's trying to get out the door, and Randall is fighting him the whole way. He followed him out to the car.
>
> [While Csehi and Cohen were fighting, Colby and the two children went to the car and were waiting to leave. Csehi was then able to leave the house.]
>
> Randall was six three. He's almost the same height, * * * they were about the same size. * * * Randall was fighting with Nick, chasing down to his side of the car. And somehow pulled him out of the car. And I'm hollering and screaming, and he had his hands around my son's throat. And he was trying to choke my son. * * * And I was there at the front of his car trying to get Randall off of him. * * * I thought Randall was following me back into the house. I thought they were done. * * * I got to the side door * * *. Randall started yelling at Nick again, and I turned * * * and I see Randall yelling at Nick, and heading back towards him. And Nick was telling him 'I have a gun, leave me alone'. And Randall's like 'you can't shoot me, I'm my own god'. And just starting going [sic] after my son, and that's when Nick shot him.

{¶8} In a recorded interview with law enforcement, Heather stated that "the first time [Csehi] tried to get in the car, Randall pulled him out and they fell in the snow and

3

then they were up [and] choking each other." At trial, Heather testified that Cohen tried to kill Csehi by choking him and that Csehi had a look in his eyes like "I'm gonna die."

{¶9} Dr. Thomas Gilson, the Cuyahoga County medical examiner, testified that Cohen received three gunshot wounds. One bullet entered the right side of his chest, collapsed a lung, and cut his spinal cord. As a result of this wound, Cohen would not have been able to stand. Another bullet struck the tip of his right thumb. A third entered his right buttock. In addition to the gunshot wounds, Cohen had abrasions and contusions on his left knee and face. There was no testimony regarding the order in which the wounds were received.

{¶10} Officer Cody Caruso of the Ashtabula Police Department responded to the scene of the shooting. A recording from Officer Caruso's body camera was played for the jury. In the recording, Csehi states that Cohen came into the kitchen screaming at him, "we both grabbed each other about at the same time and just started from there." He continued:

> I started to come outside. My shirt was already ripped. I was -- it was done and over with in my opinion. He kept following me, he kept screaming in my face, he kept putting his f***ing hands on me, * * * bumping his chest on me, spitting in my f***ing face. * * * When I got to my car he would not let me get in the car. He literally just stood at my door and any time I tried to get in he started pressing up against me. I finally got in my car. He was standing in front of the car like he was going to do some s**t. I grabbed my gun out. He started going, "go ahead motherf***er." * * * He wasn't f***ing stopping. They were begging him. I gently, gently at that, because at this point we had already fought and I proved my point. I had put my hand against his chest and gently pushed him back. I said "get out of my face you are not going to like what happens next." He kept going. I told him, I said "Randall, I'm not afraid to get my gun out right now, please get away from me." He said "mother***er, you ain't s**t, get your gun blah, blah, blah" -- f***ing instigating and s**t, and one thing led to another. All I wanted to do was go home.

4

{¶11} Kaitlyn Colby testified that, when "Randall started hitting [Csehi] and they ended up in the dining room," she took her children to the car. She placed the children in the back seat and returned to the house. When Csehi appeared in the door, she told him to follow her and went to the passenger side of their car. Csehi walked to the driver's side but Cohen "was walking down the driveway screaming more stuff at him" and "[t]rying to get in his face and hit him more." Csehi opened the door but Cohen pulled him away. Cohen began choking Csehi who was "begging that he couldn't breathe." Colby entered the car:

> I was telling the girls to look at me, and just try to focus on me. And Nicholas had gotten the door open and I hear patting, like he's patting his clothes. And he like, he says 'F, my keys'. Cuz he realized he didn't have his keys. And so I turned towards the girls and I'm just talking to them cuz they're freaking out, they're crying. * * * And then when I turned around, I'd turn around just to see Randall rushing Nicholas, and that's when the shots were fired.

{¶12} Colby could not recall how Csehi retrieved the gun from the glove box. According to Colby, Csehi was at the front of their car when Cohen lunged at him. When she turned back around again, she saw Csehi calling 911.

{¶13} Lieutenant Michael Palinkas of the Ashtabula Police Department responded to the Ashtabula County Medical Center on the night of the shooting. Palinkas interviewed Csehi at the hospital and a recording of the interview was played for the jury. Csehi described the incident as follows:

> I was talking to my mom in the kitchen about my dog * * *. Randall was in the living room. He heard me tell my mom the dog seemed skinny. He chimed in and he immediately started heading my way hostily [sic]. * * * I met him in the divider [between the kitchen and the dining room] we both grabbed each other immediately and started scuffling in her dining room. My mom and my fiancée were

5

screaming for a few minutes. I'm not entirely sure how long we were inside. I eventually made my way outside. Randall followed me, pushing on me, screaming on -- at me, getting in my face the entire time. Would not just let me walk away. I made it to my car. He pushed me up against the car, kept getting in my face, grabbed me by my neck. And then when I pushed him against his chest, he punched me in the face, started talking more s**t, starting pushing me some more. * * * I got in the car. He stood in front of my car hooting and hollering, "get your gun, you won't do s**t, blah blah blah." And then I got out of the car and I shot him. [Csehi was asked how much time elapsed between him taking a seat in the car and the shooting.] About twenty seconds. Just long enough for me to get my gun out of the glove box, load it, and get out of the car. * * * [Csehi was asked if he could have left at that point.] I should have left at that point. I understand that I should have left at that point.

{¶14} Csehi also commented that, "I can't just have somebody attack me in front of my family. I can't be attacked with my family and not retaliate."

{¶15} Three shell casings were recovered on the ground by the front bumper of Csehi's vehicle. Another was found on the passenger side windshield. And a fifth shell casing was found on the driver's seat. From the location of the shell casings, Palinkas concluded that Csehi was standing by the driver's side door when he fired and that the door was open. He also noted that there were two impacts on Heather's residence which he believed were caused by the same round (i.e., it ricocheted).

{¶16} Lieutenant Palinkas also interviewed Colby and Heather. In the interview with Colby, she did not mention Csehi looking for his keys or that he could not breathe while Cohen was choking him. She did indicate that Cohen "took a step forward" prior to the shots being fired. Both Colby and Heather indicated that they were not aware Csehi did not have the keys at the time of the shooting.

{¶17} Nicholas Csehi testified on his own behalf. As Cohen was coming at him from the living room, Csehi took off his jacket which contained his keys and cell phone.

6

It was Cohen who first grabbed Csehi in the dining room. During the fighting in the kitchen, Csehi's shirt was ripped and hanging off him. Csehi testified as follows regarding the events outside the house:

> I get outside and he's dogging my every step. He followed me all the way to the car. He pushed me, he hit me. He was grabbing me the whole way out to the car. * * * He was berating me. I couldn't take a step without feeling him on me at some point. * * * I attempt to open the door. The first time I opened the door, he grabbed my shoulder, spun me around, and shut the door. I have my back to the car now. I turned my face to look at my mother, and ask her for help. And when I did that, he sucker punched me. I looked back at him and * * * said something * * * but as I was saying it he grabbed my throat. He just started digging in with his nails. * * * [The look in his face] was like anger and rage, and malice. And a little bit of enjoyment, like he was angry but loving it. * * * At first I didn't know what to do. I've never been choked like that. But vision started to go black. I grabbed his shirt and I used the remainder of my strength to push him toward * * * the front of my car. The second he was off me, I grabbed my car door and I opened it and I got inside, and I slammed the door shut and I locked it. I got in the car and started patting my pockets. I'm not wearing a shirt, I don't have my coat. My keys aren't in my pockets. I don't have my phone. So I grabbed my gun. He's standing in front of my car, watching me. I reached in my pants pocket and put the clip in my gun. I load it. I made sure he saw me load it. I step out of the car. I said stop. And when I said stop, he took a step toward me. I shot at the ground. I was trying to let him know I was serious. * * * At that point my mentality was if I get out the car and I point the gun at him, he won't charge me. I can tell my mom to bring me my keys. I can tell her to bring me my things, and I can leave. * * * And he took a step toward me and I shot at the ground. And then he looked at the ground and looked back at me, and came again. Two steps. That's all he got. * * * According to the evidence I fired five [rounds]. I thought I only fired four. The one at the ground, and then three panicking shots. * * * I never intended to fire. And when he kept coming, I just pulled the trigger until he fell.

{¶18} Csehi further testified that he felt his life was in danger and, because of the proximity of Colby and his children, he could not allow Cohen close enough to wrestle for the gun. Given the circumstances, Csehi believed he had no choice but to fire on Cohen.

7

Case No. 2023-A-0040

"The point was I did not want to be in the altercation anymore, and I refused to continue fighting."

{¶19} The Ohio Constitution recognizes "that a court of appeals has the authority to reverse a judgment as being against the weight of the evidence." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 7. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony." (Citation omitted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25 ("a reviewing court asks whose evidence is more persuasive–the state's or the defendant's"). "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." (Citation omitted.) *Thompkins* at 387.

{¶20} Moreover, "[t]he trier of fact is free to believe or disbelieve all or any of the testimony" and "is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." (Citation omitted.) *State v. Jarrett*, 11th Dist. Trumbull No. 2022-T-0081, 2023-Ohio-1627, ¶ 13. "Consequently, although an appellate court must act as a 'thirteenth juror' when considering whether the manifest weight of the evidence requires reversal, it

8

must also give great deference to the fact finder's determination of the witnesses' credibility." (Citation omitted.) *Id.*

{¶21} In order to convict Csehi of Murder, the State was required to prove beyond a reasonable doubt that he "purposely cause[d] the death of another." R.C. 2903.02(A). "If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be." R.C. 2901.05(B)(1).

{¶22} "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense," i.e., "if the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden." *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.2d 653, ¶ 25. Where, as here, the defendant satisfies this burden of production, the prosecution must satisfy the "burden of disproving the defendant's self-defense claim beyond a reasonable doubt," i.e., the burden "of persuading the jury beyond a reasonable doubt that [the defendant] was not acting in self-defense when he [used force against another]." *Id.* at ¶ 27, 26.

{¶23} The elements of a self-defense claim include the following: "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the

9

defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." *Id.* at ¶ 14. "The state need only disprove one of the elements of self-defense beyond a reasonable doubt at trial to sustain its burden." *State v. Hardman*, 5th Dist. Stark No. 2023-CA-00046, 2024-Ohio-300, ¶ 23; *State v. Knowlton*, 11th Dist. Ashtabula No. 2023-A-0013, 2023-Ohio-3759, ¶ 18.

{¶24} In the present case, the determinative element is the second element of a self-defense claim, i.e., whether the prosecution proved beyond a reasonable doubt that Csehi did not have a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was deadly force. The Supreme Court of Ohio has described "the second element of self-defense [as] a combined subjective and objective test." *State v. Thomas*, 77 Ohio St.3d 323, 330, 673 N.E.2d 1339 (1997). "[T]he jury first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, [he] *reasonably* believed [he] was in imminent danger." *Id.* "Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an *honest* belief that [he] was in imminent danger." *Id.* at 331. "Although the term 'great bodily harm' is not statutorily defined, Ohio courts of appeal have concluded that the term is substantially similar to 'serious physical harm,' which is statutorily defined." *State v. Chavez*, 3d Dist. Seneca Nos. 13-19-05, 13-19-06, and 13-19-07, 2020-Ohio-426, ¶ 69.

Case No. 2023-A-0040

{¶25} The only point at which Csehi could objectively be said to have been in imminent danger of death or great bodily harm was when Cohen choked him. *State v. N.S.*, 10th Dist. Franklin Nos. 20AP-66 and 20AP-67, 2020-Ohio-5318, ¶ 61 ("Ohio courts have consistently held that being choked to the point of unconsciousness constitutes serious physical harm"). At trial, Csehi, Heather, and Colby all testified that, after Csehi had initially tried to enter his vehicle, Cohen pulled him away and choked him so that he could not breathe. Csehi testified that he was at the point of losing consciousness when he was able to push Cohen away from him. Pictures taken by Detective Palinkas at the Ashtabula Medical Center document abrasions at the sides and the back of his neck. Csehi claimed these were caused by Cohen trying to strangle him. Contrary to this evidence, the State notes that none of the witnesses on the night of the shooting described Cohen choking Csehi in a way that could be described as life-threatening. Heather described Csehi and Cohen as "choking each other." Colby did not mention that Csehi could not breathe. In his initial statement to Officer Caruso, Csehi did not mention that he had been choked, but rather he "gently pushed [Cohen] back" while threatening to get his gun. At the Ashtabula Medical Center, Csehi stated that Cohen "grabbed me by my neck" but without further elaboration. This evidence fairly establishes that Cohen choked Csehi. The extent to which it was reasonable for him to believe that he was in imminent danger is equivocal. The evidence as to whether he subjectively believed he was in imminent danger is far less uncertain.

{¶26} The testimony is generally consistent that, after being choked by Cohen, Csehi was able to enter his vehicle. Cohen was moving toward the house and was at the front of Csehi's vehicle. Csehi never claimed that he was in danger of death or serious

11

bodily injury at the time of the incident. After fighting with Cohen in the house, Csehi told Officer Caruso that he had "proved [his] point." Csehi then threatened Cohen to get away or else he would get his gun. Cohen continued to instigate and "one thing led to another" but all Csehi "wanted to do was go home." At the Ashtabula Medical Center, Csehi complained about Cohen pushing, punching, hooting and hollering but little else when he shot him. Csehi entered his vehicle "[j]ust long enough for me to get my gun out of the glove box, load it, and get out of the car." Csehi also stated "I can't be attacked with my family and not retaliate." Even at trial, Csehi testified "[t]he point was I did not want to be in the altercation anymore, and I refused to continue fighting." When Cohen was shot, he may have begun to move back toward the driver's side of the car, but he was still several feet away. This is compelling evidence that Csehi did not subjectively believe that he was in imminent danger. Csehi testified at trial that he believed his life was in peril and that he never intended to fire but, rather, wanted to hold Cohen at bay until he could obtain his keys which were in the house. This version of events is at odds with the testimony cited above. Several details in Csehi's trial testimony were contrary to if not contradicted by other testimony. The car keys were never mentioned as important to events of the night in question until trial. Csehi's claim to have fired a warning shot is consistent with Heather's testimony of a "quick" succession of shots. The fact that Csehi was firing from the driver's side door across the hood of his car makes it doubtful that he could have fired a warning shot into the ground.

{¶27} While there was evidence that did support Csehi's self-defense claim, there was also evidence, both competent and credible, that the shooting of Cohen was not in self-defense. As this court and others have recognized where credibility is an issue,

12

Case No. 2023-A-0040

particularly in the context of a self-defense claim, the issue is best resolved by the trier of fact. *Knowlton*, 2023-Ohio-3759, ¶ 24. The present case is not that exceptional case that merits the reversal of the conviction.

{¶28} The first assignment of error is without merit.

{¶29} In the second assignment of error, Csehi argues the trial court erred by overruling his *Batson* challenge.

{¶30} "In *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, the United States Supreme Court recognized that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of its peremptory challenges so as to exclude members of minority groups from service on petit juries." *State v. Johnson*, 88 Ohio St.3d 96, 116, 723 N.E.2d 1054 (2000); *State v. Stalder*, __ Ohio St.3d __, 2023-Ohio-2359, __ N.E.3d __, ¶ 16. "When a defendant objects to a prosecutor's peremptory challenge on these grounds, the trial court must apply a three-step analysis." *Stalder* at ¶ 16. "First, the court must determine whether the defendant has established a prima facie case of purposeful discrimination." *Id.* "To make a prima facie case of purposeful discrimination, the defendant must demonstrate (1) that members of a cognizable racial group were peremptorily challenged, and (2) that the facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race." *Johnson* at 116. "If the defendant has established a prima facie case of purposeful discrimination, then the burden shifts to the prosecutor to present a race- or gender-neutral explanation for the challenge." *Stalder* at ¶ 16. "Finally, the trial court must decide, based on all the relevant circumstances, whether the defendant has proved purposeful discrimination." *Id.*

13

"A trial court's findings of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous." *Johnson* at 116.

{¶31} In the present case, counsel for Csehi raised a *Batson* challenge to the State's peremptory challenge of [S], juror number twelve.

> David PerDue: I want it on the record that that's the only black in this panel. It seems every time I get a jury, it has a black on there. And it's only been four in thirty-eight years. It seems the State gets rid of 'em for one reason. And I think under the law there has to be a reason for that.
>
> Judge Schroeder: Ms. Cantalamessa, that is in the nature of a *Batson* challenge to be --
>
> D. Cantalamessa: She's not black. She's Asian or Indian.
>
> Judge Schroeder: Yeah, I think she is, yes.
>
> David PerDue: She's black.
>
> D. Cantalamessa: She isn't black. Is it on her questionnaire?
>
> * * *
>
> Sandra Kuhar: I don't think we put that one on.
>
> Judge Schroeder: To be honest with you, I didn't even realize the Defendant was --
>
> David PerDue: He's half.
>
> Judge Schroeder: mixed race.
>
> David PerDue: He has a mother, white mother, and a black father.
>
> Judge Schroeder: And this is in the nature of a *Batson* challenge?
>
> David PerDue: Yeah.
>
> Judge Schroeder: Ms. Cantalamessa?

14

D. Cantalamessa:    Your Honor, so Ms. [S] has an accent.  She's been on a civil jury.  She mentioned she had no transportation in the questionnaire.  Although she didn't bring it up today, I'm just afraid she's going to tell us tomorrow she can't be here because she doesn't have a car.  So that's why … as our first peremptory.

David PerDue:    That's why I'm sure the court will be putting alternates on.  If she would have a problem tomorrow.

D. Cantalamessa:    I asked her about being able to understand English, and … her accent.  So --

Judge Schroeder:    For the record, her questionnaire indicates I am very much -- and I'm reading this verbatim -- 'I am very much want to be excused.  I will be sixty-eight years of old [sic] this year.  On March 4th 2023 I had a crash and my car was totaled.  I have no vehicle right now.  It will be an incom --

David PerDue:    Inconvenience.

Judge Schroeder:    Something.   Minus or something, 'for my husband to drive me because he is seventy-one years old.  I hope you consider my request.  Thank you for …'  I believe it's cut off, but I think the last word's … in there.  There is nothing on the face of the jury questionnaire that indicates what her race or ethnicity is.  The Court will deny the challenge to the State's peremptory challenge for the reasons stated.  It's unclear to this Court what her race is.  She did, as counsel indicated, she did have an accent.  So for what that's worth.  But simply I don't have enough information regarding her ethnicity or race to sustain.  And based on the totality of the circumstances, the other things that she said with respect to transportation, there are all legitimate concerns that exist for her to be excused.  So the State's peremptory challenge number one will be sustained by the Court.

{¶32} Contrary to the trial court's determinations, Csehi claims that he did make a prima facie case of discrimination and the facts demonstrated purposeful discrimination by the State.  We disagree.  Csehi claims that a prima facie case was established by the fact that "[t]he juror in question was the only non-white member of the venire" and "Appellant is mixed race."  Brief of Appellant at 15.  The fact that a peremptory challenge

15

is exercised against a minority, without more, does not establish a prima facie case. "The litigant must then show an inference or inferences of racial discrimination by the striking party." *Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 98, 676 N.E.2d 872 (1997); *Moore v. Vannoy*, 968 F.3d 482, 491 (5th Cir.2020) ("[r]eference merely to the race of one excused venireman, without more, is insufficient to raise the inference of discrimination"). The court found that [S]'s ethnic ambiguity and Csehi's mixed-race background was insufficient to make an inference of purposeful discrimination. The court is entitled to consider "all relevant circumstances in determining whether a prima facie case exists," which includes a lack of information about the racial backgrounds of the juror and the defendant. Accordingly, we find that the court's determination was not clearly erroneous.

{¶33} Csehi relies on *State v. Lyons*, 2017-Ohio-4385, 93 N.E.3d 139 (7th Dist.), where the court of appeals noted that "Lyons satisfied the first element of a prima facie case; counsel objected after the prospective juror–who was the only African-American– was dismissed." *Id.* at ¶ 13. *Lyons* is distinguishable in the first instance because both the juror and the defendant were African-American without any issue about their racial identity. In the second instance, it was the trial court that found that Lyons had made a prima facie case and shifted the burden to the State "to articulate a race-neutral explanation for striking the juror in question." *Id.* Lyons was not challenging the trial court's determination that a prima facie case was established and the court of appeals was not reviewing the propriety of such a determination.

{¶34} The second assignment of error is without merit.

16

{¶35} For the foregoing reasons, Csehi's conviction for Murder is affirmed. Costs to be taxed against the appellant.


EUGENE A. LUCCI, P.J.,

JOHN J. EKLUND, J.,

concur.