[Cite as *State v. Brown*, 2026-Ohio-875.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

MICHAEL D. BROWN, SR.,

        Defendant-Appellant.

CASE NO. 2025-L-073

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2025 CR 000089

## OPINION AND JUDGMENT ENTRY

Decided: March 16, 2026
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Teri R. Daniel*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Brian A. Smith*, Brian A. Smith Law Firm, L.L.C., 123 South Miller Road, Suite 250, Fairlawn, OH 44333 (For Defendant-Appellant).

SCOTT LYNCH, J.

{¶1} Defendant-appellant, Michael D. Brown, Sr., appeals his convictions and sentence for Rape following a jury trial in the Lake County Court of Common Pleas. For the following reasons, Brown's convictions and sentence are affirmed.

***Substantive and Procedural History***

{¶2} On February 10, 2025, the Lake County Grand Jury returned an Indictment against Brown, charging him with two counts of Rape, felonies of the first degree in violation of R.C. 2907.02(A)(1)(b).

{¶3}    Prior to trial, Brown wrote the judge on his case complaining about appointed counsel.  The court scheduled the matter for hearing on May 12, 2025.  Brown described the nature of his complaint as follows:

> I had an issue with Mr. Fatica before and I wrote the bar on, me and him as well as talking about that since then but as well as ineffective counsel is just because it's not a lot of work being done on my character witnesses, you know, those subpoenas haven't gone out. I only seen them in about five times in five months. [Sic.]

{¶4}    To this, Attorney Fatica responded:

> Both [co-counsel] and I have met with Mr. Brown on numerous occasions, worked on his direct examination.  He's been provided discovery.  We've been trying to explain to him the limitations of character witnesses as well as the rape shield law.  He's been resistant to accept that but I feel like there's been a significant amount of work done on the case and we'll be ready when the trial begins in a week.

{¶5}    The trial court provided Brown with the opportunity to elaborate on his issues with appointed counsel:

> The reason I asked for the character witnesses is based on [sic] as well as my character as a person.  I feel like that's important because I'm not the person that's perceived as what has been perceived right now.  And also I don't feel like there was adequate time you know spent actually doing everything on the case, information, everything else. … And I asked for a continuance for my people to have enough time to actually try to find me a pro bono lawyer or a lawyer for me on my case. … I would like the continuance if possible for my family because they're worried as well and I'm worried about effective counsel for you know this is my life on the line for trial and I feel like it's important and they feel like it's important as well.  And they also have been calling over to the public defender office [sic] trying to talk to them as well last week and also they talked to somebody and they told them that they couldn't talk to my auntie and that's my emergency contact and I don't see, I didn't understand why that was because I gave her my auntie's number to talk to her, she wants to know information.  And it better helps me out that they can get somebody to help me and they're refusing to talk to her or him.

{¶6} The trial court vouched for the competence and experience of the public defender's office and Brown's trial counsel in particular. The court was "not going to interfere with that." The court explained that, if Brown's family obtained alternate counsel, it would be alternate counsel's responsibility to appear and seek a continuance.

{¶7} Lastly, Attorney Fatica addressed the court:

> I just wanted the record to be clear, I never received a bar complaint. My prior representation of Mr. Brown was at the [parole violation] hearing, he did not like the way that I handled it and kept him out of prison on that occasion but I never received a bar complaint so I'm not sure what he's talking about.

{¶8} Brown's trial commenced on May 19, 2025. The following testimony was presented:

{¶9} Danya Miller testified that she lives in Eastlake and is the mother of several children, including L.B. (age thirteen at trial), a friend of the victim in this case, M.F. In the summer of 2024, the victim rode her bicycle over to Miller's house with an adult male, which prompted her to contact the victim's mother. The victim's mother indicated that she knew the adult male and was not concerned.

{¶10} In October 2024, Miller found that there were two text-message threads on L.B.'s phone. Both threads were associated in the contacts under the victim's name although the threads were on two different phone numbers. Suspecting that one of the threads was with someone other than the victim, Miller took her daughter to the Eastlake Police Department.

{¶11} Emily Marie Stofan testified that she is the victim's mother and lives in Eastlake with her three children. Stofan's partner, Neal Earls, lives in Euclid but stays with her occasionally at her house in Eastlake.

Case No. 2025-L-073

{¶12} On about August 8, 2024, Brown, a friend of Earls, came to live at her house because "he needed a safe, sober place to stay." The victim (dob April 1, 2012) was twelve years old at this time. Brown, as well as the victim, had their own bedrooms on the second floor. Initially, Brown's presence seemed to have a positive effect on the victim's behavior. However, Stofan found the relationship "strange" in that the victim would become "upset" when Brown left the home. Stofan asked her daughter if anything was "going on" and she denied that there was.

{¶13} On the morning of September 24, 2024, Stofan went to check on the victim before school and found the door locked. She opened the door with a key. The victim was sleeping in her bed and Brown was sitting, not "fully awake," on a footstool in her closet. Stofan asked what he was doing and "the only thing he told me was my bad and he got up and walked out." The victim claimed that Brown had come home drunk and passed out in her bed. Brown later texted Stofan to apologize: "I f*cked up and passed out in her room. I know what it looks like and it's not for real." It was agreed that Brown was not allowed to hang out in the victim's room anymore.

{¶14} On October 3, 2024, Brown advised Stofan that Detective Brianna Fawcett wanted to speak with her and the victim. Stofan took her daughter to the police station where she claimed that she and Brown had had sex. From the police station, Stofan took the victim to Hillcrest Hospital for an examination by a sexual assault nurse examiner (SANE).

{¶15} Ashleigh Jane McNeil, a SANE for the Cleveland Clinic, responded to Hillcrest Hospital on October 3, 2024. During the examination of the victim, she reported four instances of sexual intercourse with Brown, the most recent intercourse occurring on

Case No. 2025-L-073

October 2. McNeil performed a physical examination using a sexual assault kit, including swabbing for DNA.

{¶16} M.F. testified that Brown came to live in their house in the summer about the time school started. They would watch movies in his room. He would help her with chores and ride bikes with her. When M.F. was grounded and had her phone taken away, she used Brown's phone to contact her friend, L.B.

{¶17} Once, Brown walked into the bathroom while she was showering and told her she was cute. On another occasion, Brown came into her room at night and asked if she wanted to have sex. She told him she was not comfortable with that, and he said that was okay. He stayed in her room and watched a movie. The next time he came into her room he repeated the question but left after she said she was not comfortable.

{¶18} One night, when everyone else in the house was asleep, Brown came into the victim's room, asked her if she would do it, and she said fine. He removed her clothes and engaged in sexual intercourse. He left her room after she fell asleep. The victim testified to having sex with Brown on four occasions.

{¶19} The victim recalled the incident when Brown passed out in her room and was found by her mother. Although they had begun having sex by that time, nothing occurred on that occasion.

{¶20} Dr. Karen Zavarella of the Lake County Crime Laboratory testified that she analyzed the evidence received from the Eastlake Police Department. Sperm was detected on the victim's vaginal swabs with a DNA profile indicating that it was 1.63 octillion (twenty-seven zeros) times more likely to be Brown's DNA than the DNA of an unknown contributor. Sperm was also detected on the victim's underwear and bedding

Case No. 2025-L-073

yielding similar results implicating Brown. One sheet contained sperm with a genetic profile indicating that it was 1.73 decillion (thirty-three zeros) more likely to be Brown's sperm than sperm from an unknown contributor.

{¶21} Brianna Fawcett, a detective with the Eastlake Police Department, spoke with Miller and L.B. on October 3, 2024, regarding possible sexual assault. As a result of this interview, Fawcett went to Stofan's home where she left her card with Brown. That evening, Fawcett met with Stofan and the victim at the police station. Although the victim initially denied having a sexual relationship with Brown, she eventually admitted it.

{¶22} Detective Fawcett returned to Stofan's home, and Brown voluntarily returned with her to the police station. Fawcett asked Brown if he had his phone with him. Brown produced the phone and began to scroll through text messages. Fawcett observed a text thread with the victim telling her to delete their conversations and then she seized the phone. Video and pictures of Fawcett scrolling through the text thread were submitted into evidence.[1] The thread contained "kissy emojis" and the admonition to delete all conversations and trash. Fawcett also obtained a buccal swab from Brown.

{¶23} Brown (age forty-three at trial) testified in his own defense. He stated he came to stay with Earls and Stofan after completing NEOCAP at Concord Pines. He claimed he was taking about eight different medications prescribed through Signature Health for PTSD, night terrors, depression, and childhood trauma. Brown could not recall the names of the medications. Brown spent most of his time in his room because he has OCD and there were multiple cats and dogs at the house.

---

1. The text observed by Fawcett was sent by Brown to the victim at 6:47 p.m. on October 3 and reads: "Delete all our conversations and trash ASAP what the f*ck the police just showed up [angry emoji]."

Case No. 2025-L-073

{¶24}   Brown recalled coming home late one night after taking his medicine, but denied that he was drinking alcohol.  The victim was awake and he walked her back to her room.  He passed out and did not remember anything after that until he woke up in her closet.  When he spoke with the victim later, the victim told him that she "tried last night."  When he asked, "huh," the victim said "yep."

{¶25}   Brown denied having any sexual interest in or relationship with the victim.  When asked to explain the presence of his DNA, Brown offered "the only thing I can think of like I said I fell asleep, she tried something … any other way it's impossible."

{¶26}   On May 20, 2025, the jury returned a verdict finding Brown guilty of both counts of Rape as charged in the Indictment.

{¶27}   On June 3, 2025, the sentencing hearing was held.   The trial court sentenced Brown to serve mandatory, consecutive prison terms of a minimum of ten years up to a maximum of life in prison for each count of Rape.  The court made the following findings in support of its sentence:

> I've reviewed the presentence report and I've also reviewed the victim impact statement.  I sat here and listened to the trial and it was very compelling testimony from the victim in this case but if, even if you doubted it, the testimony of the victim, I don't know how you get around the scientific evidence of the DNA.  So that, that scientific evidence 100 percent corroborated the testimony of the victim and there's just no getting around that so.
>
> Mr. Brown, you got up and you testified on your own behalf and the testimony that you gave and the explanation for the scientific evidence was, was absolutely incredible.   There's no way it happened like that.  And I think if I recall correctly the jury deliberated for about 25 minutes so there wasn't a lot to talk about in this case.  So there were, there was testimony indicating multiple times where this sexual conduct occurred and there were two counts in the indictment, they convicted you of both so there's no, as I sat here and listened to it and reviewed everything there's no discrepancy about what happened here.

Case No. 2025-L-073

Now whether that was a bad place for you to be or a good place for you to be doesn't matter, okay. You engaged in conduct that you clearly shouldn't have engaged in and clearly as I review the presentence or victim impact statement caused a lot of damage to that young lady. So I've considered what you said, what counsel has said and the [PSI] and victim impact statement.

…

And consecutive sentences are necessary to protect the public from future crime and for the appropriate punishment. They're not disproportionate to the deadly seriousness of your conduct and the danger that you posed to the public. And your history of criminal conduct as outlined in the presentence report demonstrate[s] that they are necessary to protect the public from future crime. And the two offenses, at least the two offenses that you were convicted of are part of a course of conduct and the harm caused by at least these two offenses were so great or unusual that no single prison term as part of the course of that conduct adequately reflects the seriousness of the conduct.

{¶28} On June 12, 2025, Brown filed a Notice of Appeal.

## Assignments of Error

{¶29} On appeal, Brown raises the following assignments of error:

[1.] The trial court abused its discretion in denying Appellant's Motion for New Counsel, in violation of Appellant's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

[2.] Appellant's convictions were against the manifest weight of the evidence.

[3.] The failure of both of Appellant's trial counsel to provide evidence of Appellant's medications, or to refresh Appellant's recollection with the names of the medications Appellant described in his testimony, constituted ineffective assistance of counsel, in violation of Appellant's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

[4.] The trial court's imposition of consecutive sentences on Counts One and Two of the Indictment was not supported by the record.

Case No. 2025-L-073

***First Assignment of Error: Motion for New Counsel; Standard of Review***

{¶30} "Where, during the course of his trial for a serious crime, an indigent accused questions the effectiveness and adequacy of assigned counsel, … it is the duty of the trial judge to inquire into the complaint and make such inquiry a part of the record." *State v. Deal*, 17 Ohio St.2d 17 (1969), syllabus. However, the "limited judicial duty arises only if the allegations are sufficiently specific; vague or general objections do not trigger the duty to investigate further." (Citation omitted.) *State v. Johnson*, 2006-Ohio-6404, ¶ 68. "The trial judge may then require the trial to proceed with assigned counsel participating if the complaint is not substantiated or is unreasonable." *Deal* at syllabus.

{¶31} "To discharge a court-appointed attorney, the defendant must show a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." *State v. Coleman*, 37 Ohio St.3d 286 (1988), paragraph four of the syllabus. Recognized examples of cause for the appointment of new counsel include: "(1) a conflict of interest; (2) a complete breakdown of communication; and (3) an irreconcilable conflict which could cause an apparent unjust result." (Citation omitted.) *State v. Burrell*, 2014-Ohio-1356, ¶ 24 (11th Dist.).

{¶32} In ruling on a motion for new counsel, "[t]he trial court's decision is reviewed under an abuse-of-discretion standard." *State v. Cowans*, 1999-Ohio-250, ¶ 27.

***The Trial Court did not Abuse its Discretion in Denying Brown New Counsel***

{¶33} Brown argues on appeal that his issues with trial counsel demonstrate a "breakdown in communication" sufficient to jeopardize his right to effective assistance of counsel. Brief of Appellant at 8. He asserts there is no basis for concluding he sought character witnesses for an improper purpose. On the contrary, he claims that such

witnesses could have served as effective rebuttal witnesses to bolster his credibility or to demonstrate that he had successfully completed treatment and was "passed out" due to medical issues beyond his control, rather than involuntary intoxication.  We disagree.

{¶34}  As an initial matter, Brown did not claim that character witnesses were necessary to bolster his credibility or establish a defense to the charges.  Rather, he desired witnesses to testify to his "character as a person" because "I'm not the person that's perceived as what has been perceived right now."  That there might be legitimate reasons to subpoena witnesses to corroborate Brown's defense or to rebut the State's evidence does not justify the substitution of new counsel.  The arguments raised on appeal are speculation, not the actual arguments presented by Brown before the trial court.  Although given the opportunity, Brown did not provide a clear indication of who the character witnesses were or what their testimony would contribute to his defense beyond attesting to his character "as a person."

{¶35}  Moreover, it is well established that "[d]isagreement[s] between the attorney and client over trial tactics or approach … do not warrant a substitution of counsel." (Citation omitted.)  *State v. Ketterer*, 2006-Ohio-5283, ¶ 150; *State v. McKelton*, 2016-Ohio-5735, ¶ 71.  Ultimately, the propriety, as well as the benefit, of presenting character witnesses falls under the scope of trial tactics or approach and, therefore, the trial court has discretion whether new counsel is merited under the circumstances of a given case.

{¶36}  Brown further argues that he was entitled to new counsel based on his difficulty in communicating with trial counsel, the failure of appointed counsel to discuss his case with family members, and his frustration (as expressed in the PSI report) with the failure of trial counsel to challenge false testimony at trial, such as whether Earls lived

at the house in Eastlake.  Again, we find no abuse of discretion.

{¶37}  Contrary to Brown's claims, we note that defense counsel countered that they had met with Brown on numerous occasions, prepared his direct examination, done a significant amount of work, and provided him discovery.  The trial court was entitled to credit counsel's representations against Brown's vague and uncertain complaints.  Brown provided no reason why it was necessary for counsel to discuss his case with family members other than his aunt wanted to "know information" and that his family was trying to find alternate, *pro bono* representation.  *Ketterer* at ¶ 149 ("[a]n indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel") (citation omitted).

{¶38}  The issue of whether Brown received actual ineffective assistance of counsel will be discussed under the third assignment of error.

{¶39}  The first assignment of error is without merit.

### Second Assignment of Error: Manifest Weight of the Evidence; Standard of Review

{¶40}  The Ohio Constitution recognizes "that a court of appeals has the authority to reverse a judgment as being against the weight of the evidence."  *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 7.  "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony." (Citation omitted.)  *State v. Thompkins*, 1997-Ohio-52, ¶ 25; *State v. Wilson*, 2007-Ohio-2202, ¶ 25 ("a reviewing court asks whose evidence is more persuasive–the state's or the defendant's").  "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines

Case No. 2025-L-073

whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." (Citation omitted.) *Thompkins* at ¶ 25.

{¶41} Moreover, "[t]he trier of fact is free to believe or disbelieve all or any of the testimony" and "is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." (Citation omitted.) *State v. Csehi*, 2024-Ohio-779, ¶ 20 (11th Dist.). "Consequently, although an appellate court must act as a 'thirteenth juror' when considering whether the manifest weight of the evidence requires reversal, it must also give great deference to the fact finder's determination of the witnesses' credibility." (Citation omitted.) *Id.*

### The Elements of Rape

{¶42} In order to convict Brown of Rape, the State was required by prove beyond a reasonable doubt that he "engage[d] in sexual conduct with another person when … [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.02(A)(1)(b). It has been held that there is no mens rea element for the state to prove under R.C. 2907.02(A)(1)(b) because it "criminalizes what is commonly known as 'statutory rape'" and "holds offenders strictly liable for engaging in sexual conduct with children under the age of 13." *In re D.B.*, 2011-Ohio-2671, ¶ 13; *State v. Carson*, 2025-Ohio-2409, ¶ 70 (10th Dist.); *State v. McCain*, 2019-Ohio-4392, ¶ 10 (9th Dist.); *In re K.A.*, 2013-Ohio-2997, ¶ 11 (8th Dist.).

### Brown's Convictions are not against the Weight of the Evidence

{¶43} Brown argues on appeal that he was "passed out" and not conscious during the time of the alleged sexual conduct with the victim, *i.e.*, he could not have engaged in a voluntary sexual act with the victim. He notes "[t]he State did not offer medical testimony, or any other kind of expert testimony, in rebuttal or to contest Brown's argument that he was 'passed out' at the time the alleged sexual acts took place." Reply Brief of Appellant at 4. Brown claims his credibility is bolstered on this point by his cooperative conduct during the police investigation: he advised Stofan that Detective Fawcett wanted to speak with her and the victim; he voluntarily accompanied Fawcett to the police station to be interviewed; and his story remained consistent.

{¶44} We find the victim's testimony corroborated by the DNA evidence to be substantially more credible than Brown's testimony. The evidence does not weigh heavily against the convictions.

{¶45} Moreover, Brown's claim that he was "passed out" during the sexual conduct is inconsistent with the evidence at trial. Rather, the evidence at trial was that, when he was passed out, no sexual conduct occurred. Stofan testified that she did not believe anything had happened between Brown and the victim on the occasion that he was found passed out in her closet. The victim testified that they did not engage in sexual intercourse that night. And Brown could not recall anything happening between them. It must be concluded that neither of Brown's Rape convictions were based on the incident occurring on September 24.

{¶46} Nor was it necessary for Brown and the victim to have engaged in sexual intercourse on September 24 to sustain either conviction. The victim testified that she

Case No. 2025-L-073

and Brown were already engaging in sexual intercourse prior to September 24. Nurse McNeil testified that sexual intercourse was last reported on October 2. Brown's DNA was found in multiple locations indicating multiple instances of sexual conduct consistent with the victim's testimony.

{¶47} To the extent that Brown suggests his medication made him incapable of voluntarily engaging in the physical act of sexual intercourse, we note that Brown only testified to being "passed out" on one occasion. And, as demonstrated above, his Rape convictions were not based on this one occasion.

{¶48} The second assignment of error is without merit.

### Third Assignment of Error: Ineffective Assistance of Counsel

{¶49} "To establish ineffective assistance, [a defendant] must show (1) that defense counsel's performance was deficient, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's deficient performance prejudiced him, i.e., that there is a reasonable probability that but for counsel's errors, the proceeding's result would have been different." *State v. Nicholson*, 2024-Ohio-604, ¶ 318. "A reasonable probability is a probability sufficient to undermine [the court's] confidence in the outcome." (Citation omitted.) *Id.*

### Trial Counsel was not Ineffective

{¶50} Brown argues that trial counsel was deficient for failing to provide the names of the medications he was taking, either in an attempt to refresh his recollection during direct examination, or to rehabilitate him after the State questioned him on cross-examination about his inability to recall the names of the medications. Brief of Appellant at 22. This failure, according to Brown, demonstrates that trial counsel made no effort to

Case No. 2025-L-073

obtain this information or have it available for trial.

{¶51}  Brown further claims that the failure to provide the names of the medications compromised Brown's credibility and ultimately resulted in his convictions. "Without more information on the specific medications Brown was taking, the jury could not determine the effects of the medications Brown was taking, or whether Brown 'passing out' was caused by a medical issue, such as the medications, or by some other cause, such as intoxication."  Brief of Appellant at 24.

{¶52}  We find neither deficiency in trial counsel's performance nor prejudice. Leaving aside the issue of whether trial counsel should have anticipated Brown's inability to recall the names of the medications he was taking, Brown's inability to recall the names would have been evident to the jury regardless of whether his memory was refreshed or whether the medical records were introduced into evidence.

{¶53}  Moreover, the identity of these medications was not material to Brown's defense.  The testimony of Stofan, the victim, and Brown was consistent that Brown was, in fact, passed out or in a state of semi-consciousness.  Nor would the identity of the medications have substantially bolstered Brown's credibility as to the reason for his unconsciousness.  The issue of whether Brown had passed out from his medications, intoxication, or a combination thereof did depend, in part, on Brown's credibility.  But simply knowing the names of the particular medications would not have substantially bolstered his credibility on this issue.  The victim testified that he was drunk.  Brown claimed it was because of his medications and drinking "a lot" of non-alcoholic beers.  The identity of the medications would not have corroborated Brown's testimony, *i.e.*, it would not have made it any more or less likely that Brown was telling truth about being passed

Case No. 2025-L-073

out because of medication and non-alcoholic drinks.

{¶54} Lastly, as explained in the second assignment of error, neither of Brown's convictions depend on whether he and the victim had intercourse on the night in question. Brown could have been involuntarily unconscious and his convictions would stand nonetheless.

{¶55} The third assignment of error is without merit.

***Fourth Assignment of Error: Consecutive Sentences***

{¶56} "The court hearing an appeal [of a felony sentence] shall review the record, including the findings underlying the sentence or modification given by the sentencing court." R.C. 2953.08(G)(2). "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing ... if it clearly and convincingly finds either ... [t]hat the record does not support the sentencing court's findings under division ... (C)(4) of section 2929.14 [to impose consecutive sentences]" or "[t]hat the sentence is ... contrary to law." R.C. 2953.08(G)(2)(a) and (b). "[A] trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 2014-Ohio-3177, ¶ 37.

{¶57} When considering the imposition of consecutive sentences, "an appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 2016-Ohio-1002, ¶ 1.

Case No. 2025-L-073

***The Record Supports the Imposition of Consecutive Sentences***

{¶58} Brown acknowledges that the trial court made the required findings for the imposition of consecutive sentences but contends that those findings are not supported by the record.

{¶59} In particular, Brown challenges the finding that "the consecutive service is necessary to protect the public from future crime or to punish the offender" and/or "consecutive sentences are necessary to protect the public from future crime by the offender." R.C. 2929.14(C)(4) and (C)(4)(c). Brown notes that he has a history of criminal convictions, including felony drug offenses, dating back to 2000, but emphasizes that they are mostly drug-related offenses. "[P]rior to this case, none of Brown's prior convictions were for sexually oriented offenses or 'offenses of violence.'" Brief of Appellant at 28. Brown also notes that, according to the Ohio Risk Assessment System, his likelihood of re-offending is only "moderate." Lastly, Brown points out that, prior to his convictions, he has worked to complete treatment programs, attended Alcoholics Anonymous, and attended to his mental health needs.

{¶60} We do not find, by clear and convincing evidence, that the record does "not support the trial court's findings" regarding the necessity of consecutive sentences to protect the public from future crime. This finding is supported by Brown's extensive criminal history, regardless of the fact that this history is primarily comprised of drug-related offenses. Brown cites no authority, and this Court is not aware of any such authority, for the proposition that the public need only be protected from future crime of a similar character to an offender's past criminal conduct. Stated otherwise, the escalation of the seriousness of Brown's criminal conduct in the present case does not obviate the

Case No. 2025-L-073

threat he poses to the public.

{¶61} We further note that "a sentencing court is permitted to consider more than the evidence supporting the convictions when determining one's sentence." *State v. Hamilton*, 2025-Ohio-4838, ¶ 36 (7th Dist.). Among the other things the court may consider are "allegations contained in a [presentence investigation] report." (Citation omitted.) *Id.*; *State v. Corey*, 2022-Ohio-4568, ¶ 79 (11th Dist.) ("the evidence the court may consider is not confined to the evidence that strictly relates to the conviction offense because the court is no longer concerned, like it was during trial, with the narrow issue of guilt") (citation omitted).

{¶62} In the present case, details of the investigation contained in the presentence report further support the trial court's finding regarding whether consecutive sentences were necessary to protect the public. The report details Brown's predatory behavior toward the victim but also toward L.B. While his behavior toward L.B. may not have been criminal, it certainly demonstrates grooming and the danger posed by Brown's inability to control his behavior, behavior for which he assumes no responsibility.

{¶63} The fourth assignment of error is without merit.

{¶64} For the foregoing reasons, Brown's convictions and sentence for Rape are affirmed. Costs to be taxed against the appellant.


MATT LYNCH, P.J.,

EUGENE A. LUCCI, J.,

concur.

Case No. 2025-L-073

# JUDGMENT ENTRY

For the reasons stated in the Opinion of this court, the assignments of error are without merit. The order of this court is that the judgment of the Lake County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.

_____
JUDGE SCOTT LYNCH

_____
PRESIDING JUDGE MATT LYNCH,
concurs

_____
JUDGE EUGENE A. LUCCI,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2025-L-073