[Cite as *State v. Bailey*, 2026-Ohio-1112.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

  - vs -

DWAN J. BAILEY,

        Defendant-Appellant.

CASE NO. 2025-L-021

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2024 CR 000333

---

## OPINION AND JUDGMENT ENTRY

Decided: March 30, 2026
Judgment: Affirmed

---

*Charles E. Coulson*, Lake County Prosecutor, and *Kristi L. Winner*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender, and *Jamie R. Eck*, Assistant Public Defender, 100 West Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

SCOTT LYNCH, J.

{¶1} Defendant-appellant, Dwan J. Bailey, appeals his convictions on multiple counts of Domestic Violence, Felonious Assault, Strangulation, Abduction, and Kidnapping. For the following reasons, Bailey's convictions are affirmed.

***Indictment***

{¶2} On April 30, 2024, the Lake County Grand Jury returned an eight-count Indictment against Bailey in Case No. 24-CR-000333, and a fourteen-count Indictment in Case No. 24-CR-000544. The two cases were consolidated under Case No. 24-CR-

000333 on October 10, 2024.

*Trial*

{¶3}    Bailey was tried between November 18 and 22, 2024.  At the beginning of trial, the following stipulations were given to the jury: "1. That Dwan Bailey has been previously convicted of two offenses of domestic violence; 2. That Dwan Baily has been previously convicted of a felony offense of violence, which was one of the domestic violence convictions that was identified in the first stipulation; 3. That Dwan Bailey and Allison F. Butcher are family or household members."  The charges against Bailey arose from incidents described by the following testimony:

**January 22, 2024**[1]

{¶4}    Allison Butcher testified that, in January 2024, she was living at the Mentor Mall Village Apartments with her and Bailey's five-year-old daughter.  Bailey had been staying at the apartment since November 2023, although Bailey and Butcher were not supposed to have contact with each other.  On the evening of January 21, 2024, Butcher and Bailey were buying groceries and had driven separately.  Their child was in Butcher's vehicle.  Butcher and Bailey began arguing in the parking lot about paying for the groceries.  Bailey wanted Butcher's phone so she could pay him using Apple Pay.  He called her phone which was in her vehicle.  The call went to voicemail which recorded part of the argument.

---

1.  The events of January 22, 2024, were the basis for the following charges: Domestic Violence (Count 1), in violation of R.C. 2919.25(A); Strangulation (Count 2), in violation of R.C. 2903.18(B)(1); Strangulation (Count 3), in violation of R.C. 2903.18(B)(2); Strangulation (Count 4), in violation of R.C. 2903.18(B)(3); Rape (Count 5), in violation of R.C. 2907.02(A)(2); Abduction (Count 6), in violation of R.C. 2905.02(A)(2); Kidnapping (Count 7), in violation of R.C. 2905.01(B)(2); and Felonious Assault (Count 8), in violation of R.C. 2903.11(A)(1).

Case No. 2025-L-021

{¶5}    The voicemail, not completely intelligible, was played for the jury.  Bailey is heard asking Butcher what is wrong with her.  Butcher is heard saying that she reacted to something that "really scared" her, and that she did not call the police (a police cruiser was in the parking lot).  The child can be heard saying "punch him," screaming, and then "mommy, get in the car."  Butcher can be heard telling the child to stop screaming and that "it's fine."

{¶6}    Butcher testified that she and Bailey continued arguing after they returned to her apartment.  Butcher went to bed and Bailey left the apartment.

{¶7}    Butcher was awakened in the morning hours of January 22 by Bailey slapping her.  He had her phone (it was under her pillow) and he was looking through it, threatening to kill her if she had been with other men.  He put his hands on her neck and choked her.  Bailey moved toward the bathroom and Butcher followed, as she said, trying to retrieve her phone and calm him down.  Bailey burned Butcher on her back with a curling iron.   Inside the bathroom, Bailey choked Butcher again "really hard."   She described it as follows: "all of a sudden I saw like a big white ring and like then it was just black and … it felt like I was watching him hold my limp body in his hands and I remember like seeing him slam me into the bathtub and I fought back like this and I can see this and like I'm not in my body."   Butcher believed she was unconscious.   She involuntarily urinated and defecated.   Butcher claimed Bailey sexually assaulted her, choked her a third time, and left for work.

{¶8}    Following the attack, Butcher testified that she felt "out of it."  She was dizzy and her vision was blurry.  There was pain on the right side of her body.  Her nose was bleeding.  She took pictures of her neck which were admitted into evidence.  Butcher

called 911 for an ambulance but police officers arrived at her apartment before the ambulance. While she was interacting with the officers, Bailey texted that he was returning to the apartment. Butcher still wanted a relationship with Bailey, did not want him to be in trouble, and did not want to upset him further, so she told the officers to leave.

{¶9} Butcher went to breakfast with Bailey and their daughter, and afterwards took the child to daycare. She then went to Hillcrest Hospital because her "throat hurt really bad." Butcher believed that Bailey used tracking to learn that she was at the hospital. He FaceTimed her while she was there. She made up an excuse for being at the hospital unrelated to the attack and he became suspicious that she was meeting another man. When she was told incorrectly that her boyfriend was at the hospital she began to scream and shake. She would have allowed herself to be admitted but left because hospital staff had contacted the police.

{¶10} Butcher herself was jealous of Bailey being unfaithful and wanted to repair their relationship. Following the events of January 22, Butcher texted Bailey that they were "meant for each other" and described the incident as a "bad fight" that "we [can] work through later after taking space."

{¶11} Megan Francis, a 911 dispatcher for the City of Mentor, testified that, at 6:33 a.m. on January 22, 2024, she received a call from Butcher requesting an ambulance. A recording of the call was played for the jury. Butcher was confused. She claimed she had been "choked out" by "an ex" within the last half-hour but would not identify her assailant. She said she had been choked and went unconscious. She said she felt dizzy. Her head hurt and she thought it had been slammed on the bathtub. When asked for her phone number, Butcher instead provided her social security number. She was concerned

about putting her laundry away and contacting a client. At one point, Butcher is heard telling herself to breathe and asking if she was alive.

{¶12} When pressed to identify her assailant, Butcher refused and said he would "really kill me." Butcher did offer that her assailant had woken her up at about 5:45 a.m. because he had found a picture of her with a man on her phone. Francis asked Butcher if the assailant's name was Dwan but Butcher replied she did not want the police to come and did not want to file a report. Butcher further advised dispatch that her daughter was at the apartment.

{¶13} Officer Mark Burton of the Mentor Police Department testified that he was one of the officers who responded to the Mentor Mall Village Apartments on the morning of January 22, 2024. He encountered Butcher sitting on the couch and talking on the phone. She was a "little bit out of it" and described herself as "dizzy." Butcher advised that she had been choked but did not want to say who it was. The room was dim. Officer Burton shined his flashlight on her neck but saw no injuries. An ambulance arrived after the police but Butcher was "just not being cooperative" so the responders departed. Officer Burton's body camera video was played for the jury.

{¶14} Pietra Foster is the director of the child-care facility where Butcher's daughter is enrolled. She recalled that, around January 22, 2024, Butcher appeared "distraught" and "upset" while dropping off her child. Foster noted that her face and neck were red and her eyes were puffy from crying.

{¶15} Jennifer Mulanax, a friend of Butcher, met her on the evening of January 22, 2024. She testified that Butcher's neck was swollen, her voice was hoarse, and it seemed painful for her to talk.

Case No. 2025-L-021

{¶16} Dr. Alexandra Haluska is an emergency medicine physician at Hillcrest Hospital who treated Butcher on January 22, 2024. Butcher reported being strangled to the point of unconsciousness, having her head slammed against a bathtub, being burned with a curling iron, and being sexually assaulted. Dr. Haluska noted bruises on both sides of Butcher's neck consistent with strangulation ("bruising over the area of the carotid arteries on both sides of her neck"). She also noted tenderness about the larynx and a hoarse voice, but no swelling or respiratory distress. There was also tenderness on Butcher's right side/ribs. A CT scan did not reveal internal injuries. Butcher reported urinating on herself which would be indicative of unconsciousness. Butcher reported moderate headache, severe neck pain, distorted vision, dizziness and nausea which are consistent with concussion. Dr. Haluska observed a second-degree burn on Butcher's right shoulder. There were excoriations ("scratching with fingernails") on her hands and arms.

{¶17} Dr. Haluska described Butcher's demeanor as "very anxious," "distressed," and "crying." During the examination, Butcher was FaceTiming with an African-American male which appeared to trigger Butcher into having a panic attack. As a mandatory reporter, Dr. Haluska contacted law enforcement regarding the strangulation to the point of unconsciousness and concern for Butcher's child. When Butcher learned that law enforcement had been contacted, she denied being strangled and claimed, instead, that it was an accident.

{¶18} Jane Bryan, a SANE (sexual assault nurse examiner) nurse or forensic nurse examiner at Hillcrest Hospital, examined Butcher on January 22, 2024. Bryan described Butcher as anxious and tearful throughout their interactions. Butcher reported

Case No. 2025-L-021

and/or exhibited several symptoms consistent with strangulation including the inability to maintain wakefulness and loss of bowel control. Bryan noted a burn on Butcher's back and injury to both sides of her neck (redness and discoloration). Butcher refused a sexual assault examination. She would not identify her assailant but she did say he was the father of her child. She did not want her assailant to be in trouble or know why she was at the hospital.

{¶19} Officer Van Snider, a Mayfield Heights Police Officer who provides security at Hillcrest Hospital, testified that Butcher was coded in hospital records under an anonymous name because of concerns that her assailant was on hospital property.

{¶20} Officer Michael Fuduric of the Mentor Police Department was contacted on January 22, 2024, by a doctor and nurse from Hillcrest Hospitals in their capacity as mandatory reporters. As a result, Fuduric sent officers to Butcher's apartment to look for Bailey.

{¶21} Dr. Christopher Vincent, a neurologist at Fairview Hospital, conducted follow-up televisits with Butcher as part of a consultation for strangulation and concussion. Vincent testified that Butcher continued to report symptoms consistent with post-concussive syndrome for months following the January 22 attack.

{¶22} Officer Lauren Shealy of the Mentor Police Department met with Butcher on two occasions after the January 22 attack. On January 23, 2024, Butcher was emotionally upset and would not talk about what happened, but agreed to adopt a "safety plan." On March 5, Butcher was more cooperative and provided Officer Shealy with photographs of her neck she had taken on January 22.

**February 3, 2024**[2]

{¶23} On the evening of February 2, 2024, Butcher and Bailey were again arguing about her messaging other men. Butcher went to sleep and, sometime in the early morning hours, was awakened by Bailey smacking her. Their daughter was in the bed with Butcher. He had Butcher's phone and was accusing her of having had a man in the apartment. Butcher sat on the edge of the bed, but Bailey choked her with both hands pushing her back on the bed. Butcher described his fingernails digging into her neck. He also pushed his knee into her calf. Butcher began to scream which woke the child. Butcher took the child to her own room and Bailey choked her in the hallway returning to the bedroom. Bailey followed Butcher into the bathroom where he choked her against the doorframe. Eventually, both of them went back to bed.

{¶24} As it was getting light, Bailey left for work but soon returned to the apartment "mad about something." Downstairs, he grabbed and squeezed Butcher's neck pushing her back onto a plastic toy box. He then acted as though he was trying to comfort her but choked her again. Finally, Bailey kicked her in the head while she was cleaning the dog's cage in the kitchen. Butcher left the apartment with the child and took pictures of her neck which were admitted into evidence.

{¶25} Butcher would call or text Bailey repeatedly after February 3. Many of the text messages expressed a desire to meet with Bailey and were sexually explicit. Butcher

---

2. The events of February 3, 2024, were the basis for the following charges: Domestic Violence (Count 9), in violation of R.C. 2919.25(A); Strangulation (Count 10), in violation of R.C. 2903.18(B)(1); Strangulation (Count 11), in violation of R.C. 2903.18(B)(2); Strangulation (Count 12), in violation of R.C. 2903.18(B)(3); Abduction (Count 13), in violation of R.C. 2905.02(A)(2); and Kidnapping (Count 14), in violation of R.C. 2905.01(B)(2).

Case No. 2025-L-021

explained that sex was a way to calm Bailey down and make him happy. Butcher also wanted to protect him so they could continue their relationship. Bailey wanted her to promise she would not be "spazzing out" and Butcher replied that she was "chill."

{¶26} Jaclyn Lynch, a nurse practitioner, met with Butcher in Lakewood on February 5, 2024, as a follow-up to the emergency room visit on January 22. Butcher was anxious and nervous and reported that a second assault had occurred but that she did not want the police involved. Butcher claimed that police involvement would only make things worse. Butcher reported that her ears were hurting and tinnitus (ringing in the ears), nausea, nosebleeds, headaches, and a sore neck. Lynch observed a purple-blue bruise about the size of a baseball on Butcher's lower left leg and a scratch under her chin, but did not observe redness about her neck.

**March 1, 2024[3]**

{¶27} Butcher went to bed with her daughter on the evening of February 29, 2024, after arguing with Bailey about money and whether she was being faithful. Bailey took her phone from under her pillow and became very angry. He dragged Butcher into the child's bedroom where he pushed her to the ground, sat on her and punched her. Butcher described being hit hard in the jaw and the eye while the rest of the blows fell about her head. She broke one of her acrylic nails struggling to get him off of her. Bailey ceased when their daughter interrupted.

{¶28} Butcher and Bailey returned to their bedroom. There, Butcher laid down on

---

3. The events of March 1, 2024, were the basis for the following charges: Domestic Violence (Count 15), in violation of R.C. 2919.25(A); Strangulation (Count 16), in violation of R.C. 2903.18(B)(1); Strangulation (Count 17), in violation of R.C. 2903.18(B)(2); Strangulation (Count 18), in violation of R.C. 2903.18(B)(3); Abduction (Count 19), in violation of R.C. 2905.02(A)(2); Kidnapping (Count 20), in violation of R.C. 2905.01(B)(2); and Felonious Assault (Count 21), in violation of R.C. 2903.11(A)(1).

Case No. 2025-L-021

the bed. She testified "he was on top of me … pinching my nose and covering my mouth and I felt like I was drowning." Bailey also tried to force sex on her and punched her in the stomach. Again, the child intervened. Bailey readied the child for school and Butcher drove her to school. While returning to the apartment, Butcher texted Bailey a sexually provocative message.

{¶29} In the following days, Butcher moved to an apartment in another city. She voluntarily met with law enforcement and took further pictures of her injuries. She also texted with a girlfriend of Bailey that she had had sex with Bailey and that she was going to send him to prison.

{¶30} Officer Steven Govedich of the Mentor Police Department met with Butcher on March 3, 2024. He took photographs of injuries sustained by Butcher including a bruise by her right eye and a broken (artificial) fingernail on her left hand.

{¶31} Officer David Paulchel of the Mentor Police Department interviewed Bailey on March 4 regarding the strangulation reported by Butcher. Bailey claimed that he had not been at Butcher's apartment since November 2023. Bailey voluntarily produced his phone indicating multiple phone calls and text messages from Butcher, but he was unable to corroborate his whereabouts from February 29 to March 1 (the locator function had been turned off).

{¶32} Patrolman Nicholas Zevnik, assisting Officer Paulchel, entered Bailey's vehicle information into the Flock license plate reader system. A photograph of Bailey's vehicle was produced taken within a quarter mile of Butcher's apartment at 7:24 a.m. on March 1.

### *Verdicts*

{¶33} Following trial, the jury returned the following verdicts:

**January 22, 2024**: guilty as to Domestic Violence (Count 1), Strangulation (Count 3), Strangulation (Count 4), Abduction (Count 6), Kidnapping (Count 7), and Felonious Assault (Count 8); not guilty as to Strangulation (Count 2) and Rape (Count 5).

**February 3, 2024**: guilty as to Domestic Violence (Count 9), Strangulation (Count 11), Strangulation (Count 12), and Abduction (Count 13); not guilty as to Strangulation (Count 10) and Kidnapping (Count 14).

**March 1, 2024**: guilty as to Domestic Violence (Count 15), Strangulation (Count 17), Strangulation (Count 18), and Abduction (Count 19); not guilty as to Strangulation (Count 16), Kidnapping (Count 20), and Felonious Assault (Count 21).

### *Sentencing*

{¶34} At sentencing, the trial court merged Strangulation (Count 3), Strangulation (Count 4), Abduction (Count 6), and Felonious Assault (Count 8) with Kidnapping (Count 7); Strangulation (Count 12) and Abduction (Count 13) with Strangulation (Count 11); Strangulation (Count 18) and Abduction (Count 19) with Strangulation (Count 17).

{¶35} The trial court sentenced Bailey to prison on the remaining counts as follows: 36 months for Domestic Violence (Count 1); 11-16½ years for Kidnapping (Count 7); 36 months for Domestic Violence (Count 9); 36 months for Strangulation (Count 11); 36 months for Domestic Violence (Count 15); and 36 months for Strangulation (Count 17). The court ordered the sentences for Domestic Violence (Count 1) and Kidnapping (Count 7) to be served concurrently with each other but consecutively to the other sentences; Domestic Violence (Count 9) and Strangulation (Count 11) to be served concurrently with each other but consecutively to the other sentences; and Domestic

Violence (Count 15) and Strangulation (Count 17) to be served concurrently with each other but consecutively to the other sentences.  Bailey's aggregate sentence is between 17 and 22½ years in prison.

### Assignments of Error

{¶36}  On February 27, 2025, Bailey filed a timely Notice of Appeal.  On appeal, he raises the following assignments of error:

> [1.] The trial court erred when it permitted State's Exhibit Eight, a recorded voicemail containing the voices of defendant-appellant, complainant and their minor child to be played in court and admitted into evidence.
>
> [2.] The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal under Crim.R. 29(A).
>
> [3.] The jury erred to the prejudice of the defendant-appellant when it returned a verdict of guilty on Counts One, Three, Four, Six, Seven, Eight, Nine, Eleven, Twelve, Thirteen, Fifteen, Seventeen, Eighteen, and Nineteen, against the manifest weight of the evidence.

### First Assignment of Error: Standard of Review

{¶37}  "Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence."  *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991).  Similarly, "the admission or exclusion of relevant evidence rests within the sound discretion of the trial court."  *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus.

{¶38}  "However, the improper admission of inadmissible hearsay evidence is a question of law, therefore, an appellate court reviews hearsay under a de novo standard of review."  *State v. Cleveland*, 2024-Ohio-2126, ¶ 25 (11th Dist.); *State v. Wallace*, 2025-

Ohio-3032, ¶ 19 (11th Dist.) (a trial court does not have discretion whether to admit hearsay); *but see HSBC Bank USA, Natl. Assn. v. Gill*, 2019-Ohio-2814, ¶ 6-10 (1st Dist.) (discussing a split of authority among appellate districts as to whether the proper standard of review regarding the admissibility of hearsay is abuse of discretion or de novo).

***The Voicemail Recording (State's Exhibit 8) does not Constitute Hearsay***

{¶39} "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C); Evid.R. 801(A) ("[a] 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion"). "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 802.

{¶40} "Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay." (Citation omitted.) *State v. Skatzes*, 2004-Ohio-6391, ¶ 132; *State v. Boyd*, 2025-Ohio-3248, ¶ 105 (6th Dist.) ("questions and commands … are not statements covered under the hearsay rule").

{¶41} The voicemail recording at issue contains commands, rather than statements, directed to Butcher by the child to "punch him" and "get in the car." These commands assert nothing and, therefore, are not hearsay. *State v. Spradlin*, 2025-Ohio-135, ¶ 17 (12th Dist.) ("because directives are not statements for the purposes of hearsay, grandmother's command to Zach not to speak to the deputy is not hearsay").

Case No. 2025-L-021

{¶42} The recording also contains these statements by Butcher: "that really scared me and that was a natural reaction to being scared" and "I didn't call the police." However, inasmuch as neither statement was admitted for the truth of the matter asserted, neither statement constitutes hearsay. *State v. Osie*, 2014-Ohio-2966, ¶ 118 ("[a] statement is not hearsay when offered for a purpose other than to prove the truth of the matter asserted"). The voicemail record, as argued by the prosecution in closing, demonstrated "the toxicity of what's going on in that relationship."

{¶43} On appeal, Bailey also argues that the voicemail recording was irrelevant and/or unfairly prejudicial. We disagree. Although the argument in the recording took place on January 21, the day before the January 22 attack, it reflects a pattern as to how these events unfolded. Each of the three attacks took place in the early morning hours and was preceded by some sort of argument the prior evening. Also, the recording corroborates Butcher's reluctance or defensiveness about involving the police, an issue that presented itself throughout the proceedings.

{¶44} Although not raised by the parties, we sua sponte consider whether the statements contained in the recording were testimonial for the purposes of *Crawford v. Washington*, 541 U.S. 36 (2004). *Crawford* stands for the proposition that, under the Confrontation Clause of the Sixth Amendment to the United States Constitution, "[t]estimonial statements of witnesses absent from trial [may be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59. The standard of review for an alleged Confrontation Clause violation is de novo. *State v. Smith*, 2024-Ohio-5745, ¶ 32. When, as here, no objection is raised at trial, a plain error review applies. *State v. Tench*, 2018-Ohio-5205, ¶ 206;

*State v. McKelton*, 2016-Ohio-5735, ¶ 191.

{¶45} Although "*Crawford* did not define the word 'testimonial,'" it is generally recognized that the "core class of statements implicated by the Confrontation Clause" are those "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at later trial.'" (Citations omitted.) *State v. Maxwell*, 2014-Ohio-1019, ¶ 35. Moreover, "later decisions seem to explain the meaning of the word by stating that testimonial statements are those made for 'a primary purpose of creating an out-of-court substitute for trial testimony.'" *Id.* at ¶ 40, quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011).

{¶46} The recording in question was inadvertently created by Bailey while trying to locate Butcher's phone. None of the persons on the recording (Bailey, Butcher, and their child) were conscious of being recorded and certainly did not foresee that anything being said would subsequently be submitted as evidence at trial. Accordingly, we find that the recording is non-testimonial so that *Crawford* does not apply.

{¶47} Not only is the recording itself non-testimonial, but (as noted above), inasmuch as the statements on the recording were not admitted to prove the truth of the matter asserted, the Confrontation Clause is not implicated. *Osie*, 2014-Ohio-2966, at ¶ 126, quoting *Crawford* at 59 ("[t]he Clause … does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted").

{¶48} We also consider whether the recording and/or the statements contained therein constitute "other acts" evidence. "Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evid.R. 404(B)(1). "This evidence

Case No. 2025-L-021

may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2). "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." (Citation omitted.) *State v. Knuff*, 2024-Ohio-902, ¶ 115.

{¶49} "Common-plan evidence generally concerns events that are 'inextricably related' to the crime charged." *State v. Hartman*, 2020-Ohio-4440, ¶ 41. "The other acts form the 'immediate background' of the present crime: they are typically either part of the 'same transaction' as the crime for which the defendant is on trial or they are part of 'a sequence of events' leading up to the commission of the crime in question." *Id.*; *State v. Morris*, 2012-Ohio-2407, ¶ 13. "Trial court decisions regarding the admissibility of other-acts evidence under Evid.R. 404(B) are evidentiary determinations that rest within the sound discretion of the trial court." *Morris* at syllabus. Again, when no objection is raised to the other acts evidence at trial, the issue is reviewed for plain error. *Knuff* at ¶ 117.

{¶50} We do not find that the evidence in question constitutes "other acts" evidence demonstrating that Bailey acted in conformity therewith. Initially, it is noted again that the statements on the recording are not declarative. They are not evidence of Bailey's character or conduct. The actual evidence that Bailey and Butcher were arguing came from Butcher herself. It was not claimed during Butcher's testimony that anything occurred during this argument approximating the Domestic Violence, Strangulation, and Kidnapping for which Bailey was on trial, and nothing on the recording suggested otherwise.

{¶51} Assuming, *arguendo*, that Butcher's testimony and the recording

constituted "other acts" evidence, they would be admissible inasmuch as the argument preceded the attack. That is, the argument was part of the "immediate background" and was "inextricably related" to the criminal conduct. As noted above, each occasion on which Butcher was attacked and strangled took place in the early morning following such an argument the previous evening. The evidence had other probative value inasmuch as the subsequent incidents involved Butcher's cell phone (Bailey searching it for signs of infidelity) and the child (whose intervention terminated the attack taking place on March 1). It was certainly within the trial court's discretion to allow such testimony.

{¶52} The first assignment of error is without merit.

### Second Assignment of Error: Standard of Review

{¶53} Sufficiency of the evidence is a "term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." (Citation omitted.) *State v. Thompkins*, 1997-Ohio-52, ¶ 23 ("[i]n essence, sufficiency is a test of adequacy"); Crim.R. 29(A). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "A challenge to the sufficiency of the evidence presents a question of law, which on appeal is reviewed de novo." *State v. Dunn*, 2024-Ohio-5742, ¶ 28.

Case No. 2025-L-021

{¶54} Although Bailey challenges the sufficiency of the evidence on every guilty verdict returned by the jury, the Supreme Court of Ohio has held that a court need only consider those convictions for which a defendant has been sentenced after merger. *State v. McFarland*, 2020-Ohio-3343, ¶ 25 ("[t]he trial court sentenced McFarland on four counts only …, so we consider the sufficiency of the evidence on those convictions only"); *State v. Harder*, 2023-Ohio-2384, ¶ 25 (8th Dist.) ("[w]hen counts in an indictment are allied offenses that are merged for the purposes of sentencing, the reviewing court need not consider the sufficiency or the weight of the evidence thereon because any error relating to those counts would be harmless"). Accordingly, we consider the sufficiency of the evidence to convict Bailey of Domestic Violence (Count 1); Kidnapping (Count 7); Domestic Violence (Count 9); Strangulation (Count 11); Domestic Violence (Count 15); and Strangulation (Count 17).

{¶55} In order to convict Bailey of Domestic Violence, the State was required to prove that he "knowingly cause[d] or attempt[ed] to cause physical harm to a family or household member." R.C. 2919.25(A). "'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶56} In order to convict Bailey of Kidnapping, the State was required to prove that he "by force, threat, or deception, … knowingly [did] any of the following, under circumstances that create a substantial risk of serious physical harm to the victim …: (1) [r]emove another from the place where the other person is found; (2) [r]estrain another of the other person's liberty." R.C. 2905.01(B)(2).

{¶57} In order to convict Bailey of Strangulation, the State was required to prove

Case No. 2025-L-021

that he "knowingly … [c]reate[d] a substantial risk of serious physical harm to another by means of strangulation or suffocation."  R.C. 2903.18(B)(2).  "'Strangulation or suffocation' means any act that impedes the normal breathing or circulation of the blood by applying pressure to the throat or neck, or by covering the nose and mouth."  R.C. 2903.18(A)(1).  "'Serious physical harm to persons' means any of the following: … (b) [a]ny physical harm that carries a substantial risk of death; (c) [a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (d) [a]ny physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; (e) [a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."  R.C. 2901.01(A)(5).  "'Substantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."  R.C. 2901.01(A)(8).

***Butcher's Testimony is Sufficient to Sustain Bailey's Convictions***

{¶58}  With respect to Domestic Violence (Counts 1 and 15), Bailey argues that "the only testimony that suggested Mr. Bailey was the aggressor, or that these incidents in fact even occurred, was from complainant herself, which was contradictory at best."  Brief of Defendant-Appellant at 15.  As an initial matter, we note that Butcher's testimony regarding the events of January 22 and March 1 are not wholly uncorroborated.  There was evidence of physical injury on both occasions; several witnesses testified regarding Butcher's emotional state on January 22; and the police had photographic evidence that Bailey's vehicle was in near proximity to Butcher's apartment at the time of the events on March 1 (contradicting his alibi).  Regardless, even if Butcher's testimony was

Case No. 2025-L-021

uncorroborated, it is still sufficient to support the Domestic Violence convictions. This court has held on multiple occasions that "a victim's testimony alone can prove domestic violence." *State v. Douglas*, 2025-Ohio-2635, ¶ 26 (11th Dist.).

{¶59} With respect to Strangulation (Counts 11 and 17), Bailey's argument is essentially the same as with respect to Domestic Violence: the only evidence that Bailey was the aggressor or that the incidents occurred was Butcher's testimony which "was largely uncorroborated." Brief of Defendant-Appellant at 14. Again, even assuming *arguendo* that Butcher's testimony of Strangulation was uncorroborated, it is still sufficient to support the convictions. *State v. Stanford*, 2024-Ohio-1451, ¶ 74 (10th Dist.) ("in a sufficiency of the evidence review, '[a] victim's testimony, alone, is sufficient to support a conviction'") (citation omitted); *State v. Ell*, 2023-Ohio-4583, ¶ 17 (12th Dist.) ("because the victim's testimony alone, if believed, was sufficient for the jury to find Ell guilty … beyond a reasonable doubt, Ell's suggestion that his felonious assault conviction was not supported by sufficient evidence is meritless").

{¶60} With respect to Kidnapping (Count 7), Bailey argues that "the State failed to prove that the complainant's liberty was ever restrained" inasmuch as the events occurred at Butcher's apartment and she did not testify that she attempted or was not permitted to leave. Brief of Defendant-Appellant at 16.

{¶61} Contrary to Bailey's argument, it was not necessary that Butcher attempt or be prevented from leaving her apartment in order to satisfy the element of Kidnapping that her liberty be restrained. "Under Ohio law, '[r]estraining an individual's liberty means limiting or restraining their freedom of movement,' and '[t]he restraint need not be for any specific duration or in any specific manner.'" (Citations omitted.) *State v. Hodge*, 2025-

Case No. 2025-L-021

Ohio-4434, ¶ 69 (10th Dist.). Stated otherwise, "[t]he element of restraining another's liberty may be proven by evidence that the defendant has 'limit[ed] one's freedom of movement in any fashion for any period of time.'" *State v. Totarella*, 2010-Ohio-1159, ¶ 118 (11th Dist.); *State v. Hackett*, 2019-Ohio-1091, ¶ 84 (7th Dist.) ("[m]omentary restraint is sufficient to qualify as restraint; the duration of the restraint does not have to be prolonged").

{¶62} Here, Butcher's liberty was necessarily restrained by the act of Bailey strangling her on at least two occasions on January 22. Butcher testified that Bailey choked her on her bed for about "a minute" so that "[she] couldn't breathe and [she] felt a lot of pressure right here in the big front of [her] neck." Again, Bailey restrained her liberty when he choked her in the bathroom to the point of unconsciousness. *State v. Pace*, 2025-Ohio-2874, ¶ 60 (10th Dist.) (sufficient evidence of Kidnapping exists where the victim was strangled to the point of unconsciousness). In a similar way, it has been held that the crimes such as Rape and Aggravated Robbery necessarily entail the restraint of another's liberty. *See State v. Winn*, 2009-Ohio-1059, ¶ 21 (Aggravated Robbery) and ¶ 23 (Rape).

{¶63} The second assignment of error is without merit.

### Third Assignment of Error: Standard of Review

{¶64} The Ohio Constitution recognizes "that a court of appeals has the authority to reverse a judgment as being against the weight of the evidence." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 7. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting

testimony." (Citation omitted.) *Thompkins*, 1997-Ohio-52, at ¶ 25; *State v. Wilson*, 2007-Ohio-2202, ¶ 25 ("a reviewing court asks whose evidence is more persuasive–the state's or the defendant's"). "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." (Citation omitted.) *Thompkins* at ¶ 25.

{¶65} Moreover, "[t]he trier of fact is free to believe or disbelieve all or any of the testimony" and "is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." (Citation omitted.) *State v. Csehi*, 2024-Ohio-779, ¶ 20 (11th Dist.). "Consequently, although an appellate court must act as a 'thirteenth juror' when considering whether the manifest weight of the evidence requires reversal, it must also give great deference to the fact finder's determination of the witnesses' credibility." (Citation omitted.) *Id.*

**January 22, 2024**

{¶66} Bailey was convicted of Domestic Violence (Count 1) and Kidnapping (Count 7) with respect to the events of January 22, 2024. He maintains that these charges are "based almost entirely on complainant's testimony of her 'story' [Butcher's word] of what occurred" and Butcher's testimony is not credible. He notes the following: Butcher provided inconsistent accounts of how she was awakened by Bailey on the morning of

Case No. 2025-L-021

January 22 as well as the times and sequence of events. Butcher described Bailey slamming her phone with "lots of force" but she was able to use it to call 911 and take pictures of her injuries. Officer Burton did not observe injuries on her neck. Butcher went to breakfast that morning with the man who she claimed strangled her. Dr. Haluska did not detect lacerations, bruising, or tenderness on Butcher's head. She described Butcher's voice as "hoarse" but did not have a baseline to establish that. The CT and CTA scans were negative. The majority of Butcher's symptoms were self-reported. The day after the attack Butcher was assuring Bailey that they were meant for each other and describing the events as a bad fight.

{¶67} The points raised by Bailey are all valid points that the jury could consider in evaluating Butcher's credibility, but they do not render her testimony wholly incredible. There were demonstrable injuries: bruising on her carotid arteries and a second-degree burn on her back. Butcher reported a loss of bowel control which is consistent with strangulation although not an obvious symptom. Butcher reported many symptoms consistent with post-concussive syndrome which, as several of the medical witnesses testified, is generally not discernible through medical imaging. A friend of Butcher confirmed that her voice was hoarse following the attack. Several witnesses testified that Butcher's demeanor ranged from shaken to bewildered (as she appeared in the 911 recording) to anxious and tearful throughout the course of the day. Witnesses at Hillcrest Hospital testified that Butcher became very emotional and panicked when FaceTiming with her assailant, whom she would not name but identified as the father of her child. Finally, it makes little sense for Butcher to fake or exaggerate her injuries given her efforts not to identify Bailey as her assailant or involve the police.

Case No. 2025-L-021

**February 3, 2024**

{¶68} Bailey was convicted of Domestic Violence (Count 9) and Strangulation (Count 11) with respect to the events of February 3, 2024. Bailey's arguments with respect to the events of February 3 also focus on Butcher's unreliability as a witness. He also claims that the actual injuries she received do not "line up" with her account of the events. Although she documented the scratches on her neck, she did not take a picture of the large bruise on her leg that caused her to cry out. Nor did the pictures of her face reflect injuries consistent with being kicked in the face by a boot. Lastly, a day after the purported assault Butcher is texting Bailey wanting to meet him and have sex with him.

{¶69} Again, Bailey raises valid points but they are not so compelling that the jury's verdicts must be rejected. Bolstering Butcher's credibility was the testimony of the nurse practitioner, Lynch. Unlike on January 22, Butcher did not seek medical attention following the February 3 attack. However, at a follow-up appointment to the emergency room visit a couple of days later, she did reveal that there had been a second attack while still protecting the identity of her assailant. Lynch observed the large bruise on Butcher's leg that she claimed Bailey caused and a scratch under her chin. Lynch described her as anxious and nervous. Butcher reported a variety of symptoms such as ringing in her ears, nausea, nosebleeds, headache, and soreness in her neck. Contrary to Lynch's advice, Butcher would not go to the emergency room because the police had been contacted the last time she went.

{¶70} Admittedly, her desire to continue the relationship with Bailey is difficult to comprehend but such behavior is not unheard of in cases of domestic abuse. Just as the assault itself is corroborated by the injuries observed by and reported to Lynch, Butcher's

Case No. 2025-L-021

feelings for Bailey are corroborated by her refusal to involve the police or risk getting him in trouble. Ultimately, Butcher's feelings toward Bailey (which she claimed were also motivated by a desire to appease him and avoid further abuse) are not irreconcilable with the facts of the assault.

**March 1, 2024**

{¶71} Bailey was convicted of Domestic Violence (Count 15) and Strangulation (Count 17) with respect to the events of March 1, 2024. Bailey's argument focuses on Butcher's credibility and motivation for bringing the accusations. During the events of March 1, Butcher described a (uncharged) sexual assault during which she was "scared." Despite this claim, Butcher texted Bailey after dropping their child off at school that she hoped they could have sex "before he left" the apartment. Bailey also contends that Butcher's "true motive/intention for finally coming forward" to law enforcement was revealed in text exchanges with a particular "lady friend" of Bailey. In them, Butcher brags about having sex with Bailey and states that she is going to send him to prison.

{¶72} As noted above, the jury is entitled to consider Butcher's motivations in evaluating her credibility but, in the end, her motivations for reporting the crimes are a separate issue from whether Bailey committed the crimes. In other words, if there is credible evidence that Bailey committed the crimes it does not matter whether Butcher was motivated to report the crimes by self-preservation, revenge, or some combination of them or others. On the whole, we find Butcher's testimony credible and, to a degree, corroborated by the physical evidence and testimony of the other witnesses. This is not the case where the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶73} The third assignment of error is without merit.

{¶74} For the foregoing reasons, Bailey's convictions are affirmed. Costs to be taxed against the appellant.


MATT LYNCH, P.J., concurs,

ROBERT J. PATTON, J., concurs in judgment only with a Concurring Opinion.


_____


ROBERT J. PATTON, J., concurs in judgment only with a Concurring Opinion.

{¶75} I concur fully in the majority's disposition of the second and third assignments of error raised by plaintiff-appellant, Dwan Bailey ("Bailey"). I concur in judgment only with respect to the disposition of Bailey's first assignment of error regarding the trial court's admission of a recorded voicemail, State's Exhibit 8.

{¶76} The majority correctly defines hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). A "statement" includes "an oral . . . assertion. . . ." Evid.R. 801(A). "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by [the Ohio Rules of Evidence], or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 802.

{¶77} Here, the recording contained statements by Bailey, Butcher, and their minor child. The child's statements included "punch him" and "Mommy, get in the car." Butcher's recorded statements included: "[t]hat really scared me and that was a natural reaction to being scared," and "I didn't call the police." Prior to the introduction of the recording, defense counsel objected to the admission of the exhibit on the grounds that Butcher's and the minor child's statements were hearsay. The trial court offered several exceptions to the hearsay rule, including present sense impression and excited utterance as a basis for its admissibility. *See* Rule 803(1) and (2). The State did not suggest to the court below that the statements were offered for a reason other than the truth of the matter asserted; albeit it appears the State was given little opportunity to do so on the record.

{¶78} On appeal, the State asserts, for the first time, that the statements are not hearsay because they were not offered for the truth of the matter asserted. At first blush, none of the statements appear to have been offered for the truth of the matter asserted: that Butcher got into the car, that Butcher struck the defendant, or that Butcher did not call the police. However, "'[w]here the facts to be proven at trial and the substantive content of an out-of-court statement coincide, it can be presumed that the proponent is offering the statement for its truth.'" *In re O.H.*, 2011-Ohio-5632, ¶ 25 (9th Dist.)*, quoting State v. Richcreek,* 2011-Ohio-4686, ¶ 23 (6th Dist.). "If, however, the statement is explicitly offered without reference to its truth, then under Evid.R. 801(C) it is not hearsay." *Rivercreek* at ¶ 23, citing *State v. Clay*, 2010-Ohio-2720, ¶ 27 (5th Dist.); *State v. Price,* 80 Ohio App.3d 108, 110 (9th Dist. 1992). Therefore, it is presumed that a proponent of evidence of an out-of-court statement is offering it for the truth of the matter asserted, unless it is plainly offered for different purpose.

Case No. 2025-L-021

{¶79} Here, the recording included out-of-court statements by Butcher and her child. When the State introduced the voicemail recording, the following exchange took place:

> [ASSISTANT PROSECUTOR]: And is this what started the whole series of events that led to the point where you were at the hospital?
>
> [MS. BUTCHER]: Yes.

After the recording was played, the State then inquired:

> [ASSISTANT PROSECUTOR]: Okay. I know it's kind of hard to hear in the beginning. What had happened you were saying, "Look, I didn't call the police."
>
> [MS. BUTCHER]: We were outside the car arguing. He was calling looking for my phone. Sorry. This is -- that was in my car because we were fighting about I wanted him to give me my groceries back and he was saying that I couldn't get them back until I gave him money and then we were fighting back and forth; right? So I had called him trying to talk to him because he locked the doors and the windows and was like laughing playing on his phone and wouldn't give me the groceries I just bought. And so then I had called him because we were outside fighting and then I called him and I said, "No, just get out, just let me get my stuff." And he was like, "Okay. Give me money." Something happened, we were fighting, and then I was trying to like get past him to get into the car to get my stuff out of his car without having to give him money and it was -- that was my phone calling him.
>
> . . .
>
> [ASSISTANT PROSECUTOR]: It was left on your voicemail on your phone?
>
> [MS. BUTCHER]: It was left on my voicemail, yeah.
>
> [ASSISTANT PROSECUTOR]: It came from your voicemail. And was there a police officer or something

Case No. 2025-L-021

in the parking lot? Is that why you had to say something?

[MS. BUTCHER]: No, but as we pulled up, there was police pulling in.

[ASSISTANT PROSECUTOR]: Okay. So that wasn't about this? You hadn't called them?

[MS. BUTCHER]: No, I hadn't called them.

{¶80} The facts to be proven at trial to convict the defendant of domestic violence, strangulation, abduction, kidnapping, and felonious assault as charged in Counts 1, 3, 4, 6, 7, and 8 of the indictment and the out-of-court statements including "punch him" coincide. Therefore, it can be presumed that the State, as the proponent, is offering the statement for its truth as probative evidence of the crimes charged.

{¶81} When taken in context with the presentation of evidence and the State's characterization at trial, as well as the absence of any argument in the record that the statements were offered for some other reason than the truth of the matter asserted, these statements were hearsay. In other words, the statements were offered for the truth of the matter asserted, i.e., to establish the starting point of the event which resulted in Butcher's injuries and the criminal charges against Bailey.

{¶82} Indeed, the recording was replayed during the State's closing arguments where the State characterized the recording as what "starts the ball rolling" and explained "at that point in time it's pretty evident from listening to that the toxicity of what's going on in that relationship." Taken in context, it appears the proponent of the evidence, the State, did offer the statements for the truth of the matter asserted even if an argument could be made to the contrary.

{¶83} The majority notes and I acknowledge, that "'[s]tatements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay.'" *State v. Skatzes*, 2004-Ohio-6391, ¶ 132, quoting *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999), citing *United States v. Stratton,* 779 F.2d 820, 830 (2d Cir. 1985). Here, it is not the case of directives or commands. These statements were offered to show the start of the event which ultimately resulted in Butcher's injuries and the underlying criminal charges. Accordingly, I would conclude, as the parties and trial court presumed below, that the out-of-court statements were hearsay.

{¶84} Thus, it is necessary to determine whether the hearsay statements fall within one of the recognized exceptions under Evid.R. 803 or 804. I conclude that the statements would fall under the excited utterance exception to the hearsay rule. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). The Supreme Court of Ohio has established a four-part test to determine the admissibility of statements as an excited utterance:

> "'Such testimony as to a statement or declaration may be admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such

domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.'" [*State v. Taylor*, 66 Ohio St.3d 295, 300-301 (1993)], quoting *Potter v. Baker*, 162 Ohio St. 488 (1955), paragraph two of the syllabus.

(Emphasis omitted in *Aboytes*.) *State v. Aboytes*, 2020-Ohio-6806, ¶ 55 (11th Dist.) quoting *State v. Taylor*, 66 Ohio St.3d 295, 300 (1993). *See State v. Jones*, 2012-Ohio-5677, ¶ 166.

{¶85} This court has further held "that 'when determining whether a statement is an excited utterance, the court should consider: (a) the lapse of time between the event and the declaration; (b) the declarant's mental and physical condition; (c) the nature of the statement; and (d) the influence of intervening circumstances.'" *Aboytes* at ¶ 56, quoting *State v. Kalia*, 2003-Ohio-4226, ¶ 18 (11th Dist.). Here, the statements on the recording were excited utterances as they related to a startling event or condition observed by the declarant, the statements were made while the startling event was occurring, while the declarant was under the stress of excitement caused by the event. Therefore, the statements fell within an exception to the hearsay rule and were properly admitted.[4] As the statements were properly admitted and we find no error, we need not address the harmless error doctrine as raised by the parties.

---

[4] The statements were nontestimonial and do not run afoul of the Sixth Amendment of the United States Constitution pursuant to *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

Case No. 2025-L-021

{¶86}  Accordingly, I would affirm the trial court's decision for the reasons set forth above.

Case No. 2025-L-021

# JUDGMENT ENTRY

For the reasons stated in the Opinion of this court, the assignments of error are without merit. The order of this court is that the judgment of the Lake County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.

_____
JUDGE SCOTT LYNCH

_____
PRESIDING JUDGE MATT LYNCH,
concurs

_____
JUDGE ROBERT J. PATTON,
concurs in judgment only with a Concurring Opinion

| THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY |
| --- |
| A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure. |

Case No. 2025-L-021